# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | |
|---|---|
| DAVID NIGHTHORSE FIREWALKER-FIELDS,<br><br>*Plaintiff*,<br><br>v.<br><br>JACK LEE, *et al.*,<br><br>*Defendants*. | CASE NO. 7:17-cv-00400<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

David Nighthorse Firewalker-Fields, a Virginia inmate proceeding *pro se*, filed this civil rights action pursuant to 42 U.S.C. § 1983,[1] naming as Defendants Jack Lee, who is the Superintendent of the Middle River Regional Jail ("MRRJ"), and the Middle River Regional Jail Authority. In general terms, the Verified Complaint, as supplemented,[2] alleges that Defendants' policies, practices, and customs at the MRRJ promote Christianity, prohibit Muslim religious practices, and unfairly and disproportionately house Muslim inmates in segregation.

In ruling on Defendants' Motion to Dismiss, I dismissed Plaintiff's claims for declaratory and injunctive relief, (Dkt. 43), which had been mooted by his transfer from the MRRJ to the Virginia Department of Corrections. *See Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (inmate's transfer rendered moot his claims for injunctive and declaratory relief). In light of that dismissal, I also dismissed his claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, *et seq.*, noting that damages are not available under RLUIPA. (Dkt. 42, 43).

---

[1] I omit internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted. *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

[2] I previously construed a memorandum filed by Firewalker-Fields (Dkt. No. 19) as a Motion to Amend his Verified Complaint, granted the Motion, and deemed the Verified Complaint supplemented with the information presented in that memorandum. (Mem. Op. 2 n.1, Dkt. 42).

Three claims remain in this case: a claim under the Free Exercise Clause of the First Amendment, a claim under the Establishment Clause of the First Amendment, and a claim under the Equal Protection Clause of the Fourteenth Amendment. Firewalker-Fields' allegations are that the MRRJ broadcasted weekly Christian religious services on televisions and also allowed Christian faith-based classes, but it refused to allow "Islamic Jumuah [F]riday prayer services[,] which are a required part of the Islamic faith[,] and Islamic Faith Classes." (Verified Compl. 2, Dkt. 1.) He also alleges that the classification system established by Lee at the MRRJ has resulted in the majority of the Muslim inmates being placed into "Max" pods. (Supp. to Verified Compl. 2–3, Dkt. 19.) According to Firewalker-Fields, inmates in "max" pods are basically in "forced segregation," are on lockdown all but three hours per day, and are "ineligible for any institutional programs geared toward rehabilitation or religion." (*Id.*)

Defendants filed a Motion for Summary Judgment on the three remaining claims, (Dkt. 56), Plaintiff Firewalker-Fields responded, (Dkt. 59), and Defendants filed a reply (Dkt. 61), making the matter ripe for disposition. Having reviewed the record, the Court concludes that the Defendants are entitled to summary judgment on all remaining claims. This opinion also will address other pending motions, to the extent that they are not mooted by the summary judgment ruling.

## I. Background

### A. First Amendment Claims

According to the MRRJ's Program Director, John Lilly, the MRRJ's inmate population is overwhelmingly Christian. (Lilly Decl. ¶ 4, Dkt. 57-2.) Nonetheless, the MRRJ makes accommodations for various other faiths and religions. As relevant here, the MRRJ permits Muslim inmates to keep prayer rugs and soft-covered Qurans in their cells, offers special meal times during Ramadan, and provides a year-round, pork-free diet. Also, each inmate is permitted

to place a spiritual advisor on his visitation list. Each inmate may visit with his spiritual advisor once per week and may pray with the spiritual advisor. If an inmate places an imam on his visitation list, the inmate may pray with the imam on Fridays starting at 12:30 p.m. Firewalker-Fields never placed an imam on his visitor list. (*Id.* ¶¶ 5, 7, 8.)

To accommodate its large group of Christian inmates, the MRRJ provides a religious service on Sunday mornings, broadcasting it to closed-circuit televisions located in the "day rooms" attached to each housing unit. There is no evidence in the record as to how often Plaintiff—or even other inmates—otherwise obtain access to these "day rooms," the conditions of the "day rooms" compared to the "housing areas," and whether inmates who go to the day rooms for the programming have the ability to engage in any kinds of recreation during, before, or after the programming.

The weekly services are taped and donated by a Mennonite group. Defendants reference the services as "non-denominational," but it is also undisputed that the services have "Christian themes." (*Id.* ¶ 2.) The service is shown during lock-down hours and any inmate may go to the day room to watch; to avoid watching it, an inmate may stay in his "housing area." (*Id.*) The MRRJ's system is a closed-circuit television system, and the MRRJ has no way to show a video to inmates without playing it on every television at the MRRJ. (*Id.* ¶ 3.)

Several factors affect the availability of a Friday Muslim service in which inmates gather together to pray.[3] First, the MRRJ has a policy prohibiting inmates from leading any group, including a religious group. The security reasons for this prohibition include preventing "formation of a 'gang' mentality" and avoiding "the risk that inmates will take orders from other inmates rather than MRRJ officers." (*Id.* ¶ 11.) Thus, the MRRJ prohibits group worship in the

---

[3] Based on Plaintiff's requests for relief, it appears that an Islamic prayer service over television would not be sufficient to accommodate his faith. Instead, he specifically requested to have services on Fridays "held in the Gym or classrooms instead of on Television." (Dkt. 19 at 7.)

absence of an approved, volunteer faith group leader. Lilly emphasizes that all classes hosted at the MRRJ—religious and non-religious alike—are provided by donation or on a voluntary basis. (*Id.* ¶¶ 9–11.) As Lilly summarizes, "[j]ail safety, resources, willing volunteers, and inmate demand necessarily factor into the available religious programming at the MRRJ." (*Id.* ¶ 10.)

Second, both Lilly and Faye McCauley, an Operation Specialist at the MRRJ, state in their affidavits that no imam or other Islamic leader has volunteered to lead any religious activities at the MRRJ, despite its efforts to reach out to the local Muslim community. (*Id.* ¶ 12); McCauley Decl. ¶ 6). The outreach efforts consisted of repeatedly calling the nearest mosque, although no one answered any time McCauley called, and there was no way to leave voice-mail. (McCauley Decl. ¶ 6).[4] Additionally, no Muslim groups participate in either of the two local re-entry councils, which are community groups designed to assist inmates in re-entry and which are also a "source of outside assistance and programming." (Lilly Decl. ¶¶ 13–15; McCauley Decl. ¶¶ 4–6.) Nor has the MRRJ received any donations of taped services or other materials from any Muslim group. (Lilly Decl. ¶¶ 12, 20.) In contrast, the MRRJ has more local (presumably Christian) church groups "volunteer to provide programming than [the MRRJ] can accommodate." (*Id.* ¶ 12.) There is no contrary evidence in the supplemented Verified Complaint on any of these facts.

**B. Equal Protection Clause**

Firewalker-Fields raises a two-part claim under the Equal Protection Clause of the Fourteenth Amendment. First, he alleges that Christian inmates were allowed to participate in congregational prayer each Sunday and attend religious classes but that Muslim inmates were not. Second, he alleges that the classification system at the MRRJ (which he alleges was established by Lee) "has sequestered the majority of the Muslim inmates" into maximum-security pods. As

---

[4] McCauley does not state that anyone from MRRJ ever reached out by letter or any other method other than calling.

4

to the second of these allegations, this Court previously construed it to be a claim that "defendants' policies, practices, and customs cause Muslim inmates to be housed in segregation at a greater proportion than Christian inmates because of religious affiliation."[5] (Dkt. 42, at 7.)

## II. Standard of Review

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In making that determination, I must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249–50).

---

[5] Although Defendants are correct that Firewalker-Fields does not challenge on its face the MRRJ's policy preventing max inmates from attending classes, (Dkt. 57, at 14 n.7), he alleges that Muslim inmates are disproportionately classified and assigned to maximum-security housing areas. In his requests for relief, moreover, he asks that the Court order that maximum pods be abolished, instead requiring the MRRJ to distinguish maximum offenders with different jumpers or ID bracelets. (Dkt. 19, at 5). He claims this would allow him and others the opportunity to practice their religious beliefs. Thus, he does implicitly challenge his inability to attend classes as a maximum-security inmate.

5

Firewalker-Fields is proceeding *pro se* and, thus, he is entitled to a liberal construction of his pleading. *See, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). In the Fourth Circuit, verified complaints by *pro se* inmates are to be considered as affidavits when the allegations contained therein are based on personal knowledge. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). Thus, I treat the allegations in his signed complaint as sworn facts offered in opposition to the Motion for Summary Judgment. Because his brief in opposition is not sworn or verified, however, statements in the brief are not evidence that may be considered on summary judgment. *United States v. White*, 366 F.3d 291, 300–01 (4th Cir. 2004).

### III. Analysis

#### A. Free Exercise Claim

The First Amendment protects an individual's right to the free exercise of religion. U.S. Const. amend I. To state a claim that prison officials or regulations have violated his right to freely exercise his religion, Plaintiff must first prove "(1) he holds a sincere religious belief; and (2) a prison practice or policy places a substantial burden on his ability to practice his religion." *Wilcox v. Brown*, 877 F.3d 161, 168 (citing *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)).[6] As explained by the Fourth Circuit,

> a substantial burden is one that puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, or one that forces a person to choose between following the precepts of her religion and forfeiting [governmental]

---

[6] The Court notes at the outset that there appears to be a lack of clarity as to whether a prisoner claim alleging, through Section 1983, violation of the Free Exercise Clause should be governed by the U.S. Supreme Court's opinion in *Emp. Div., Dep't of Human Resources v. Smith*, 494 U.S. 872 (1990), or whether it should be governed by the Court's pre-*Smith* cases that more squarely deal with such claims in the prisoner context, namely *O'Lone v. Estate of Shabazz*, 422 U.S. 342 (1987) and *Turner v. Safley*, 482 U.S. 78 (1987). *Levitan v. Ashcroft*, 281 F.3d 1313 (D.C. Cir. 2002) (finding that "many courts have grappled with the question of how the Court's decision in Smith interacts with the prisoner-specific test set forth in *Turner* and *O'Lone*"); *Hines v. South Carolina Dep't of Corrections*, 148 F.3d 353, 357 (4th Cir. 1998) (noting the dispute and declining to resolve it). Neither party contends that *Smith* applies in this case, and so, accordingly, the Court need not resolve the issue. *See Levitan*, 281 F.3d at 1319 (declining to address the issue where the Government did not contend that *Smith* applied). And while the Fourth Circuit has not resolved the issue explicitly since noting it in *Hines*, the Fourth Circuit has since applied *Turner* and *O'Lone* in cases such as the one at bar. *See, e.g., Wilcox v. Brown*, 877 F.3d at 169; *Jehovah v. Clarke*, 798 F.3d 169, 176 (4th Cir. 2015).

benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand.

*Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006).

If the plaintiff establishes a substantial burden on his sincerely held religious belief, the defendants' policy or practice at issue will withstand a Free Exercise Clause challenge so long as it is "reasonably related to a legitimate penological interest." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). In deciding whether such a regulation is so reasonably related, courts have applied the *Turner* factors:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

*Lovelace*, 472 F.3d at 200 (quoting *Turner*, 482 U.S. at 89–92). In weighing these factors, the Court must "respect the determinations of prison officials." *United States v. Stotts*, 925 F.2d 83, 86 (4th Cir. 1991). Further, the Court also must avoid "the micromanagement of prisons," *id.* at 99, and instead "accord substantial deference to the professional judgment of prison administrators." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). Critically, the inmate carries the burden of proof under the *Turner* analysis to disprove the validity of the prison regulation at issue. *Id.* The Court finds that, here, Plaintiff Firewalker-Field has failed to meet that burden.

Defendants assert that Plaintiff's claim under the Free Exercise Clause fails because: (1) his religious beliefs are not sincere;[7] (2) his inability to participate in a group prayer on Fridays

---

[7] To support their assertion that Firewalker-Fields' religious beliefs are not "sincere," Defendants point to information concerning his requests for materials related to different religions in the weeks before

7

did not substantially burden his religious rights; and (3) the policies that resulted in a lack of a Friday Muslim service are reasonably related both to security and managing the MRRJ's limited resources.

The Court has already found in its prior decision on Defendants' Motion to Dismiss that Plaintiff's religious beliefs were substantially burdened by the MRRJ's policies, (Dkt. 42), insomuch as they prevent him from participating in Friday group prayer as Plaintiff desires. (Dkt. 42, at 6). Plaintiff feels compelled by his religious beliefs to participate in a group prayer service and group religious classes with other Muslims each Friday (Verified Compl. 1, 4, Dkt. 1). Defendants are careful to note that Plaintiff could have listed an imam as a voluntary spiritual advisor with whom to pray, but he failed to do so. (Lilly Decl. ¶ 8). But, with reasonable inferences being drawn in favor of the Plaintiff at this stage, this measure would seem to require that Plaintiff be familiar with an imam outside of the prison who would be willing to visit the prison for the weekly Jumuah. Barring Plaintiff from this weekly prayer with willing Muslims on the site of the jail, then, would seem to be a substantial burden on Plaintiff's ability to practice his faith.

Turning to the other issues on appeal, the Court need not address Defendants' arguments regarding the sincerity of Plaintiff's religious beliefs (*e.g.*, McCauley Decl. ¶¶ 8–10), because the Court agrees with the Defendants that Plaintiff has not disproven the validity of the MRRJ's regulations, or otherwise demonstrated that they are not "reasonably related to a legitimate penological interest." *Wilcox,* 877 F.3d at 169 ("Even when a prison policy substantially burdens a prisoner's religious practice," the policy will not violate the First Amendment if [the requirements of the *Turner* test are not satisfied]"); *Jehovah*, 798 F.3d at 176 (citing *Overton v.*

---

he requested an ability to attend Muslim services, as well as his self-identification, within a year after leaving MRRJ, as Catholic. (*See, e.g.*, McCauley Decl. ¶¶ 8–10.)

*Bazzetta*, 539 U.S. 126, 134 (2003) (stating that the Plaintiff bears the burden of disproving the validity of the prison regulations at issue)).

The lack of a service and classes resulted from the combination of two MRRJ policies—1) its prohibition on inmate-led services, and 2) its policy of offering programming only by approved outside volunteers—coupled with the lack of volunteers willing to lead an Islamic service or to otherwise donate Islamic materials (like the video donated by the Mennonites).[8] (Lilly Decl. ¶¶ 11–15). Based on the below analysis, I therefore conclude that these policies are reasonably related to legitimate penological interests.

As to the first of the *Turner* factors, there is a valid and rational connection between a general policy of prohibiting inmates from leading religious or other services and the security reasons given for that policy: to prevent gang mentality and prevent inmates from exercising undue influence over other inmates. Likewise, relying entirely on donations for the provision of services is consistent with an interest in conserving prison resources. It appears, moreover, that the policy of solely using approved volunteers to provide programming is applied even-handedly to religious and non-religious programming alike.

To the extent that Plaintiff's complaint is that the MRRJ provides a service for Christian inmates—allowing such inmates to leave their housing areas during lock-in hours to attend—that

---

[8] In their Motion for Summary Judgment, Defendants go on to claim that, even if there were a volunteer willing to lead Muslim services, they would not allow a service for a religion with so few participants because doing to so would be "detrimental" to the MRRJ at this time. (Lilly Decl. ¶ 21). According to Lilly, because there are many individual inmates and small groups of many different faiths, allowing Muslims, who represent approximately 0.6% of the inmate population, to hold a service would spark a "ripple" effect because other small religious groups would expect services of their own. He explains that "[t]he MRRJ does not have enough space, staff, or willing volunteers to support services and classes for every approved faith group. When the Jail is inevitably unable to accommodate every small religious group, inmate morale would decrease, which would increase safety risks." (*Id.*) Lilly also avers that the MRRJ "does not have the human resources to supervise a group Jumah service midday on Fridays." (*Id.* ¶ 7.) It is not necessary to reach in this case whether such a refusal to hold services in that circumstance would constitute a constitutional violation. Here, it is sufficient that, during the time Firewalker-Fields was housed at MRRJ, there was no volunteer to lead prayer services, and no volunteer provided a televised service comparable to the one provided by the Mennonites. Moreover, as discussed, the MRRJ provided other alternatives for Firewalker-Fields to practice his religion.

9

policy, too, bears a valid, rational relation to preserving prison resources and prison security. As Lilly notes, the overwhelming majority of inmates at the MRRJ are Christians. The MRRJ receives numerous donations and volunteers willing to provide Christian services and run faith-based classes. By contrast, the Muslim population in 2018, the year after Firewalker-Fields was transferred out, was 0.6%. Although, as Firewalker-Fields correctly notes, inmates constituting a minority religious group have a constitutional right to freely exercise their religion subject to reasonable restrictions, that does not translate into a First Amendment right to require prisons to provide the same services to smaller inmate populations as they provides for much larger groups under their care and supervision. *See, e.g.*, *Smith v. Kyler*, 295 F. App'x 479, 481 (3d Cir. 2008) ("Smith's free exercise rights were not violated by the DOC's policy to provide Chaplains for only the largest major faith groups and to prohibit group worship in the absence of an approved, volunteer Faith Group Leader. The District Court correctly noted that the DOC has a legitimate interest in managing limited financial resources and in maintaining prison security."); *Adkins v. Kaspar*, 393 F.3d 559, 565 (5th Cir. 2004) (rejecting the plaintiff's assertion that, "regardless of the availability of volunteers, space, or time," defendants should be required to accommodate every religious holiday and requirement of a religion constituting less than one percent of the inmate population).

As the Supreme Court explained in *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972), the phrase "reasonable opportunities . . . to exercise the religious freedom guaranteed by the First and Fourteenth Amendment" does not mean that "every religious sect or group within a prison—however few in number—must have identical facilities or personnel." Thus, "[a] special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand." *Id.* This is particularly true where, as here, there is sworn testimony that there are more than thirty smaller religious groups

(or groups of one) that would likely then request comparable services and classes for their religion. *Turner*, 482 U.S. at 90 (noting that where a requested accommodation will have a "significant 'ripple effect' . . ., courts should be particularly deferential to the informed discretion of corrections officials").

As to the second *Turner* factor—the availability of alternative ways for Firewalker-Fields to practice his religion—the Court concludes that, although the Friday group prayer is important or even required in Firewalker-Fields' faith, the prison afforded numerous other ways in which Firewalker-Fields could have observed his faith. As noted previously, 1) Plaintiff could have named an imam on his visitor list and then visited and prayed with the imam on Fridays,[9] 2) all Muslim inmates are permitted a prayer rug and soft-cover Quran in their cells, 3) all Muslims are provided special meal times during Ramadan, and 4) Muslim inmates are provided a pork-free diet year-round. *See O'Lone*, 482 U.S. at 352 (finding that accommodations for Ramadan and a pork-free diet were sufficient prison accommodations where the ability to participate in Jumuah was restricted).

The third *Turner* factor—the effect of an accommodation on staff and prison resources—is more neutral than the first two, but still lightly favors Defendants. As explained, to the extent the policy prohibiting inmate-led services is grounded in security concerns, then accommodating Plaintiff by allowing an inmate-led service has all the risks referenced in discussing the first *Turner* factor above. Similarly, the MRRJ's policy of only allowing classes—religious and non-religious—if they are led by an approved volunteer or via donated materials is a reasonable one

---

[9] In his unsworn response to the summary judgment motion, Firewalker-Fields accuses defendants of being inconsistent because Lilly's affidavit says both that MRRJ is on lockdown from 11 a.m. to 1:30 p.m. daily, but that plaintiff could have met with an imam at 12:30 p.m. on Fridays. As I understood Lilly's testimony (and as defendants explained in their reply), meeting with an imam is an exception to the lock down and professional visiting begins at that time. Firewalker-Fields does not present any evidence to dispute Lilly's testimony on this issue.

that conserves the jail's resources.[10] If the MRRJ were to begin locating and paying persons to run services or classes, that would have a substantial impact on the resources and require additional staff to ensure security.

As to the fourth *Turner* factor—whether there is an obvious, easy alternative to the policies—one is not readily apparent, and Firewalker-Fields has not suggested one.

Accordingly, application of the *Turner* factors lead to the conclusion that the MRRJ's policies and lack of volunteers, which result in there being no Muslim group service or Muslim-based classes, do not violate Firewalker-Fields' rights under the Free Exercise Clause.

This conclusion is consistent with numerous federal courts that have upheld restrictions on inmates leading other inmates in group religious services. *Baranowski v. Hart*, 486 F.3d 112, 121 (5th Cir. 2007) (stating that prison policy of prohibiting inmates from leading religious services without the assistance of a rabbi or approved outside volunteer was logically connected to penological concerns of security, staff, and space limitations); *Smith*, 295 F. App'x at 481 (holding that no violation of free exercise rights occurred where the policy provided chaplains only for the largest faith groups and prohibited group worship in the absence of an approved, volunteer leader); *Anderson v. Angelone*, 123 F.3d 1197, 1198–99 (9th Cir. 1997) ("Requiring an outside minister to lead religious activity among inmates undoubtedly contributes to prison security."); *Johnson-Bey*

---

[10] To the extent that Plaintiff takes issue with the fact that those interested in engaging with the Christian programming may leave their housing areas during lock-down hours, Plaintiff has provided no facts to suggest that MRRJ could accommodate this in any other way—let alone what effect such an accommodation would have on the resources of the prison. He merely states that connecting the opportunity to go to the day room during lock-down hours with the offering of Christian programming essentially results in a policy of "Be Christian or be penalized." (Dkt. 59, at 4). Perhaps, but neither has Plaintiff substantiated that assertion with facts. At this stage, Plaintiff must present more than a mere scintilla of evidence to support his allegations that there is any benefit to going into these day rooms during lock-down hours over staying in one's housing area. *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995). This requirement is heightened where, as here, Plaintiff bears the burden of disproving that the prison's policy is reasonably related to a legitimate penological interest. *Overton*, 539 U.S. at 134.

12

*v. Lane*, 863 F.2d 1308, 1310 (7th Cir. 1988) (finding constitutional a regulation prohibiting inmates from conducting their own religious services).

The conclusion is also consistent with cases in which courts recognized that a lack of volunteers related to a certain faith did not translate into a burden imposed *by defendants*. *E.g.*, *Brown v. Collier*, 929 F.3d 218, 231 (5th Cir. 2019). Here, as in *Brown*, "it is not the [prison policy] that has imposed a burden on Muslim inmates' religious exercise. It is the lack of volunteers who adhere to the faith of Islam." *Id.*

For the foregoing reasons, I will grant Defendants' Motion for Summary Judgment as to Firewalker-Fields' claim under the Free Exercise Clause.

### B. Establishment Clause Claim

The Court also construes Plaintiff's Verified Complaint as setting out a claim for relief under the Establishment Clause. (Verified Compl. 2, Dkt. 1) ("Middle River Regional Jail under the leadership of Jack Lee broadcasts Christian Religious Services and holds Christian faith classes."). Plaintiff contends that a number of courts have analyzed prisoner claims outside of the framework established by the U.S. Supreme Court in *O'Lone* and *Turner*. (Dkt. 59, at 13). The Supreme Court has not directly addressed which standard of review applies to an inmate's claim of an Establishment Clause violation. *See Brown v. Collier*, 929 F.3d 218, 243 (5th Cir. 2019). At the very least, it is evident that the *Turner* framework does not apply to all asserted violations of *all* constitutional rights. *See Johnson v. California*, 543 U.S. 499, 515 (2005) (asserting that strict scrutiny is the proper standard of review for equal protection challenges to a state prison's policy of racially segregating prisoners for an introductory period following entrance to a new correctional facility). Rather, the *Turner* factors are most appropriately applied in contexts where the right is one that "need necessarily be compromised for the sake of proper prison administration." *See id.* at 510.

This District has previously acknowledged that "the inherent tension between the Establishment and Free Exercise Clauses is exacerbated in the prison context, where inmates often cannot practice their religious beliefs without some active involvement of the prison administration." *Berry v. Deeds,* Case No. Civ. A. 799cv00254, 2001 WL 515259 at *4 (W.D. Va. March 27, 2001) (Wilson, J.). In this context, courts consequently apply the Establishment Clause less strictly, especially when "the claim at issue involves accommodation issues as well as Establishment Clause issues." *Id.* As the Fifth Circuit has remarked,

> Prison officials . . . are *required* to facilitate opportunities for prisoners to worship or otherwise exercise religious beliefs even though, outside the prison context, such involvement would undoubtedly implicate Establishment Clause concerns. When policies ostensibly designed to honor the Free Exercise rights of inmates are challenged on the basis that they violate the Establishment Clause because the policies favor one or more faith groups over another, logic demands that *Turner*'s standard applies.

*Brown*, 929 F.3d 218, at 244. The Court both finds this logic compelling and applicable to the case at hand, which poses to the prison such a conflict in constitutional obligations. As the conduct underlying Plaintiff's Establishment Clause is the same as that which underlies at least one of his apparent Free Exercise challenges—namely, that MRRJ hosts Christian programming during lock-down hours, but it fails to provide such programming for Muslims—the analysis and the conclusion remains the same. *See School Dist. of Abington Tp. v. Schempp*, 374 U.S. 203, 222 (1963) (noting the overlap between the Establishment Clause and the Free Exercise Clause). Thus, because the Court concluded that the prison's policy of playing volunteer-provided Christian-themed materials during lock-down hours is reasonably related to a legitimate penological interest, Plaintiff's claim fails whether grounded in the Free Exercise Clause or the Establishment Clause.

### C. Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend.

XIV, § 1. The Equal Protection Clause thus directs that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1982). To establish an equal protection violation, a plaintiff "must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination"; once this showing is made, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Veney v. Wyche*, 293 F.3d 726, 730–31 (4th Cir. 2002) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)); *see Johnson v. California*, 543 U.S. 499, 515 (2005) (asserting that strict scrutiny, not the *Turner* factors, is the proper standard of review for equal protection challenges to a state prison's policy of racially segregating prisoners for an introductory period following entrance to a new correctional facility). To succeed on an equal protection claim, a plaintiff must set forth "specific, non-conclusory factual allegations that establish improper motive." *Williams v. Hansen*, 326 F.3d 569, 584 (4th Cir. 2003). "[M]ere conclusory assertions" of discriminatory intent are insufficient. *Id.*

Firewalker-Fields' equal protection claim has two aspects to it. The first is his assertion that Muslim inmates are treated differently than Christian inmates because Christians are able to observe the television service and have group religious services, while Muslims cannot. But Firewalker-Fields has not demonstrated that he is similarly situated to followers of those religions or that the alleged unequal treatment is the result of intentional or purposeful discrimination. As already noted, the population of the MRRJ is overwhelmingly Christian, while Muslims constituted only 0.6% of the population in 2018. Moreover, while there are ample volunteers to teach Christian faith-based classes and the Mennonites donated Christian-themed taped services, the undisputed evidence is that there have not been any similar Muslim volunteers or donations. (Lilly Decl. ¶ 20) ("To date, the MRRJ has not had an imam or Islamic group volunteer to lead

15

any programming at the MRRJ or provide any type of services, taped or otherwise."). This leads the Court to find that Muslims are not similarly situated to Christians at the MRRJ. Thus, the first part of Plaintiff's equal protection claim fails. *Smith*, 295 F. App'x at 484 (granting summary judgment for defendants as to a similar equal protection claim).

The second portion of his claim is a claim that the classification system at the MRRJ is designed so that Muslims are purposefully placed in maximum security. Not only does this allegation appear in the unverified, unsworn supplement to his complaint, (Dkt. 19, at 2–3), but Firewalker-Fields presents nothing other than his own conclusory allegation that Muslims are treated differently. As noted above, such allegations are insufficient to sustain an equal protection claim. *See Williams*, 326 F.3d at 584. Moreover, in contrast to his vague assertion of discriminatory intent, Defendants have provided sworn testimony that "Firewalker-Fields' classification as a maximum-security inmate was determined from an objective point system based on criminal background and other risk factors" and that it had "no relation to his religious preference." (Lilly Decl. ¶¶ 18–19 & Ex. B thereto). In the absence of any evidence from which a jury could find that there was purposeful or intentional discrimination, there is no dispute of material fact as to this portion of his claim.

For the foregoing reasons, I will grant defendants' motion for summary judgment as to plaintiff's equal protection claim.[11]

---

[11] Defendants also argue that Superintendent Lee cannot be held liable because he had no personal involvement in setting programming policy and, in a footnote, that Lee is entitled to qualified immunity. (Dkt. 57, at 18 n.9). Plaintiff, without providing any other documentation and the Court having been unable to confirm the claim, argues that MRRJ is a private prison, and its employees are therefore ineligible for qualified immunity. (Dkt. 59, at 18). In light of my ruling on the merits of the claims, it is unnecessary to address either Lee's personal involvement or the issue of qualified immunity.

## IV. Remaining Pending Motions

There are a number of other pending motions in the case. Because some of them arguably are not mooted by my ruling on summary judgment, I address those briefly. First, there are two potentially dispositive motions filed by Firewalker-Fields, neither of which has any merit. The first, Plaintiff's Motion for Default Judgment, (Dkt. 65), will be denied because the Defendants are not in default. The second, a Motion for Judgment on the Pleadings, (Dkt. 67), argues that a statement in my prior opinion ruling on the Defendants' motion to dismiss is dispositive of the issue on summary judgment. Specifically, Firewalker-Fields relies on the Court's statement that "I disagree" with Defendants' argument "that [he] fails to state a claim because he allegedly fails to show a 'substantial burden' to his religious exercise." (Dkt. 42 at 5). From this, he claims that I have already ruled that he has shown a substantial burden on his rights. A ruling that a complaint states a claim in the context of a Rule 12(b)(6) motion does not preclude a ruling against that same claim at the summary judgment stage. Thus, assuming that these motions are not moot, I will deny them.

Firewalker-Fields recently also filed a Motion to Take Depositions. (Dkt. 69). He lists a number of persons that he says could establish his sincerity of beliefs and to "provide expert testimony as to the requirement of Friday Congressional Prayer." (*Id.* at 1). To the extent this motion can be liberally construed as a request under Rule 56(d) that he needs discovery in order to respond to the summary judgment motion, his motion is lacking an affidavit or declaration and is also untimely, filed after the time for responding to the summary judgment motion had passed. More importantly, though, I have found that neither the matter of Plaintiff's sincerity, nor the issue of whether the group Friday prayer is a requirement of his faith, are necessary to decide this case on summary judgment. Thus, these depositions (which he states would address only those two

issues) are not needed to respond to the summary judgment motion.  Thus, Plaintiff's Motion to Take Depositions, (Dkt. 69), will be denied.

In light of my ruling on summary judgment, the remaining motions in the case, (Dkt. 47, 49), will be denied as moot.

## V. Conclusion

For the reasons stated herein, I will grant Defendants' Motion for Summary Judgment, (Dkt. 56), and enter judgment in Defendants' favor.  Plaintiff's various motions seeking default judgment, summary judgment, and to take depositions, (Dkt. 65, 67, 69), will be denied.  The remaining motions in the case, (Dkt. 47, 49), will be denied as moot.

An appropriate order will be entered.

**ENTERED** this  30th  day of September, 2019.

_____
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE